This is Huzhou Chuangtai V. Chen. Thank you. Good morning, your honors. My name is Amiad Kushner. I represent the appellant, Hui Qin, and may it please the court, this appeal presents very important issues related to Article 5.1.B of the New York Convention. Article 5.1.B allows a court to decline to enforce an arbitration award against a party that was not given proper notice of the arbitration or the appointment of the arbitrators or was otherwise unable to present its case. If it allows, it does not require, right? Do you agree? Absolutely. It's not required, although under the facts of this case, notice was deficient and severe prejudice resulted. Wasn't the notice reasonably calculated to reach the respondent in the arbitration? I mean, didn't they use an address that was in the agreement? The record shows that notice was not reasonably calculated. Why is that? Well, let's start with the purported Chinese language default judgment. And before I get into a description of the judgment, let me just walk you through procedurally when it was raised for the first time because I think it's important, your honor. We've read the briefs. I asked a direct question, which is, could you explain to me why it wasn't reasonably calculated? The very first notice that is conceded did not reach Mr. Chen. Why that notice was not reasonably calculated to reach him, given that, and I may be mistaken about the facts, so that may be the answer, given that the address that was used was the address given for him in the agreement that underlay the arbitration? Well, first of all, the Chinese language default judgment is not, does not represent. He's talking about the supplemental agreement. I mean, I think my colleague is talking about the supplemental agreement. That was the one that Chen provided, and at no point did Chen update that address. Why wasn't that one sufficient? So the question relates to the first attempt at notice at the so-called building address. We're not even talking yet about the fact that he had actual notice and that he eventually did get notice and that they tried three different times at three different addresses to get it to him. I'm just asking about the very first one and asking why was that not reasonably calculated to reach him? We're not disputing that in the first instance, sending the notice to the address contained in the arbitration provision is reasonable. In fact, it's more than reasonable. That's what every arbitral institution does. The first thing you do is... Then let me stop you there for one second and ask, is that not the standard that due process in the United States addresses? Was the notice that was given reasonably calculated to reach the person who would be bound by the judgment or order or whatever? Yes, but that's not the question presented by this case. You can explain that to me in a moment. I would have thought, and I thought that the law was pretty clear, that the standard in the New York Convention is addressed by the standards of notice of the country that is being asked to enforce the judgment, right? Correct. And is that not the due process clause in the United States? It is. And is the standard under the due process clause for what constitutes reasonable notice, notice that is reasonably calculated to reach the defendant? Unless, as the United States Supreme Court held in Jones v. Flowers, the notice that is sent to that address is returned undelivered. But Jones v. Flowers says take additional reasonable steps, and they tried two different times after that. So even if Jones creates, and I know that there's some dispute about if Jones creates a different standard beyond the one that Judge Lynch is talking about, how are those other two steps not additional reasonable steps? Well, again, if a notice is returned as undelivered, Jones v. Flowers says you go back to the drawing board. It doesn't satisfy due process. It effectively restarts the clock. If they didn't do anything and just rested on that, that would be the case. But then they did what Jones says they should do. They tried again. Can you tell me what you think they should have done instead to try it again? Yes. They could have done at least two things. They could have looked at pending Chinese court cases, and there were dozens of them, where Mr. Chin was represented by counsel. There were active cases. It was public information in China. They could have reached out to his lawyers in China and said, hey, we're trying to serve an arbitration order against your client. Here's the notice of arbitration. Second, we put in a sworn statement from Mr. Chin in the district court saying that he was in touch constantly with an executive of Petitioner's Parent Company, and they knew from those conversations that he was living in the United States. They had actual knowledge of that. That was never rebutted in the district court. They had actual knowledge. Wasn't the same lawyer representing all of them, and the arbitration entity went and asked that lawyer, give us better addresses for them? That didn't happen until the district court case. That was not at the time of the arbitration in China. At the time of the arbitration in China, they never reached out to that lawyer. Never. So they came to the southern district, and they had no problem serving Mr. Chin in New York because he lives in New York. And we're saying we put in evidence in the district court. At that time, the arbitration was over, and he participated in the arbitration. He defended himself in the arbitration. Can you explain to me why he didn't have an adequate opportunity to defend himself in the arbitration? Well, he did appear at the hearing, but he was provided with notice not until late October of 2020, which is months and months, not only after the notice of arbitration is purportedly served, but several months after the arbitrators are selected. They're selected in August. So you're saying that because he didn't get to, he would have had a different outcome if he had gotten to have more influence in the arbitrator?  But that has to be the prejudice, right? I mean, where's the prejudice, if not that? The prejudice is due to the structure of arbitration and the fact that because, as the 10th Circuit stated in the C case, which is discussed in our briefing and ignored by the other side, the arbitral tribunal, and I'm quoting from the 10th Circuit decision, determines the party's rights with virtually no possibility of appeal or review, and thus depriving a respondent of the right to participate in appointing the arbitral tribunal itself evidences substantial prejudice. That's the prejudice. It doesn't matter. Your Honor was asking, he was able to participate in the hearing, but without having a chance to select the arbitrator. That's the prejudice. And the selection, the arbitrators in this case had no experience in complex financial transactions. We're talking about $500 million. So basically your argument is that had he gotten notice earlier, then he would have had more influence over who the arbitrator was, and then maybe he would have gotten a different result, right? Like that's the prejudice you're asking us to find, right? No, it's not. It's not. It's not. Your Honor, as a matter of law, under the 10th Circuit's decision to seek… Under the 10th Circuit, they're finding us. Let's try again. Let's try a reset here. What we're looking at is the New York Convention. We're looking at arbitration. When people come here complaining about arbitration, I often feel like the godfather at the beginning of the movie. You showed us no respect. You didn't come to the courts. You chose arbitration. You agreed to arbitrate. You agreed to vest lots of power in this arbitration system in another country. That's fine. That's your right. But then you come here, and you're not satisfied with the arbitration. You're not satisfied with what you bargained for. You're not satisfied with the arbitrator's decision as to what was fair notice and what wasn't. And you're asking us to second-guess this.  That's not how it works. You opted for a system that may not be as fair in order to have the efficiency, in order to have whatever people think they get from arbitration. You can't come back here and say, well, this didn't go the way it might have gone in a federal court. Well, boo-hoo, it didn't. Well, with all due respect, Your Honor, I have a different perspective on that issue. The New York Convention is a treaty of the United States. Yes, and it gives us certain authority when there has been a fundamental denial of due process. Which has occurred in this case, Your Honor. Okay, I hear your argument. That's the argument. Unless Your Honors have further questions, I'll reserve the balance of my time. Thank you. If you don't mind starting from the proposition that if your client knew that he wasn't at any of the addresses, does that change the due process analysis? Sure, Your Honor. First of all, both the district court and the arbitration tribunal found actual notice, and I want to highlight that up front. But even if they found the opposite, that there was no actual notice, the Supreme Court has held that, quote, due process does not require that a property owner receive actual notice. And that's from Flowers, and that's also citing back to other cases decided in the Supreme Court, such as Mullane and Dusenbury. But the reason I ask is there's got to be some limits, right? Like it wouldn't have been appropriate to send them to each of our three home addresses and said we took reasonable steps because we tried, right? There needs to be, the doctrine doesn't seem to have some sort of good faith requirement or the like. So what does one do in the circumstances in which if it were true that a party knew that the opposing party wasn't at the particular address and yet they got sent out anyway? It's not a box to check. I mean, there's got to be some force to it. So I'm asking what would we do in that circumstance? Thank you, Your Honor. I'll start by saying that we believe Flowers' standard there is higher than what's required in arbitration. But even under the Flowers standard, what did the Supreme Court say? The Supreme Court said, and they specifically gave their analysis of what could have been done next. They said after that certified mail was sent and then returned without ever being received, they said you could have just mailed it back to that same address writing dear occupant. Okay, so I've read Jones v. Flowers a bunch of times. The question I'm trying to ask, and I apologize if I'm not asking it plainly enough, but I'll try again. If your client knew that none of the subject of the target of the notice was not at any of the addresses, would it have still been appropriate to send those addresses anyway? I'm sorry, to send the notices there anyway? Yes, because the second address is his home where his father lives. And that is an appropriate address to make sure that notices reaches him. The third address is the address for the fourth respondent in the arbitration, which is actually controlled by Chin. That's a finding of the arbitration tribunal. And it was addressed to Mr. Peng Yun, who formerly worked for Chin and knows Mr. Chin. These are addresses, even if, even if, which we don't agree, these addresses had no connection to Mr. Chin. They did have connections to people who could put Chin on notice. And that's more than enough under any standard, including the higher standard of Flowers. Would it make a difference if the petitioners in the arbitration knew that his actual address was One Park Avenue, New York, New York, and didn't choose to divulge that to the arbitration tribunal as an address to use? It's an interesting question because, obviously, that's not the case. They sent it to every address they knew of. The problem here, Your Honor, is exactly what's kind of unique about Mr. Chin is he has many, many homes. So we sent it to three addresses in China. And in the U.S., in the confirmation proceeding, it was sent to four more of his homes. And it was denied at each home. Now, if he only has a single home, you need to send it there. But if a person has four homes, I believe it's reasonable to send it to one and then try another and then try another, which is what we did. In our case, we sent to all four, and he denied notice at all four. And I take it there is no finding by the arbitrators and no finding by the district court to the effect that the petitioners knew of a specific address that was a better address than the ones that were used. There's no such finding by either court. And what's even more interesting here, Your Honor, is that Mr. Chin has never at any point stated what specific address he was allegedly living at at the time of service or at any point in time. He's never given the specific address. Because it seems as if what he says about where he lives and doesn't live is not altogether reliable, since he said he hadn't been in China in 10 years in one affidavit. And then somewhere else, he says, gives evidence that he was in China during that precise period. So maybe it wouldn't be all that helpful even if he had. But I take your point that he did not. Both the district court and the arbitration tribunal found that he's not credible. For the arbitration tribunal, I would refer the court to page 20, where they note that in 2018, the first notice in advance of the arbitration was sent. And Chin denied receipt of that notice even though, and I'll quote the arbitration tribunal, even though petitioners, quote, presented original mail vouchers which contained the signature of the recipients, end quote. So here, Chin had actual notice. Actual notice was found by the arbitration tribunal and by the district court. That's a factual finding. It can only be reversed for clear error. Here, there's no error. It's not even close to error. Chin had actual notice and notice was also reasonably calculated to reach Chin because service went to Chin's address for notice in the underlying agreement, judicial service address, his judicial service address, his registered address. The address he testified is, quote, my home, end quote, where his father lives, where he keeps his ID card, where he picks up his stuff. The address in his 2020 divorce decree, the address listed in 89 judgments, and the address where service was signed for. And prior to serving the complaint, petitioner sent Chin two other notices, the first of which was the 2018 notice that was signed for that he denied receiving. Petitioner sent the notice of default in 2019. And I just heard opposing counsel say that petitioner somehow had actual notice that he was in the U.S. in 2019 just during this oral argument. But Chin admits he lived in China 11 months in 2019. He also testified that he was in China in at least January, February, and March of 2020. Petitioners filed arbitration in March of 2020. Listing as the address that address in the underlying agreement, which states that documents are deemed served three days after sending to that address. Again, it's his address for judicial service, his registered address, divorce decree address, service address, 89 judgments. The tribunal also found he's the actual controller of the other three companies in the arbitration. Page two of the award states that the first respondent was successfully served at its corporate headquarters in May 2020. Page 43 of the award states Chin is the 100% owner of that company, SMI Shengdian. All respondents shared the same arbitration counsel who is also Chin's divorce attorney. So are you saying that your colleague misinformed me when he said that they did not have the same counsel until the district court? In the arbitration, all four respondents shared the same counsel. I'm not sure if that perhaps he misspoke, but they shared the same counsel in the arbitration proceeding. So, again, service far exceeds the flower standards. Also, returning a mailing does not mean no service. In Tianjin court, this court found notice despite some mailings being sent back. And in the confirmation proceeding, Chin and his wife sent back notice sent to four homes, even though he had notice, which we know, because he had hired counsel the day after we sent notice to the first of those homes. It's like the Elvis song Return to Sender. The ex-girlfriend keeps sending back the letters. It doesn't mean she didn't get notice. She just doesn't want them. Chin denied notice at three addresses in China, four homes in the U.S. He claims that none of the three other respondents received notice. That's 10 attempts at notice that all allegedly failed. He never provides any address where notice could succeed. And he never tells us where he was living at any specific point in time. When Chin was served in his car, he didn't say, oh, finally, somebody actually gave me real notice. What he said was, no, no, no. And he threw the service papers out his Rolls Royce, out the window, into the street. He is not credible. Thank you, Your Honor. With respect to the point about the arbitration, I want to ask you are an officer of the court. Is that correct? Absolutely. And you have a duty of candor. Is that correct? I do. OK, please explain yourself. So Miss Fong Liu, who was Mr. Chin's arbitration counsel, also represented the other three respondents. Wasn't that exactly the question that I asked? You had asked, I think you had asked, did the petitioners reach out to Miss Fong Liu? That's not what I asked. I asked, didn't they have the same counsel at arbitration? Oh, OK, absolutely. But she was not retained until around late October, early November of 2020 in the arbitration. Why, when I asked if they had the same counsel at arbitration as the other folks involved, did you tell me no? I must have misunderstood the question. She was retained. So if she was the same and she knew that there was arbitration happening because she represented other people, why can you, with a straight face, tell us that Mr. Chin was prejudiced by not hearing? I understand the question now. There absolutely is nothing in the record which suggests that Miss Fong Liu had notice of this arbitration back in June of 2020 or so, or May of 2020, when the first respondent was served. In fact, when Miss Fong Liu appeared in CTAC arbitration, her very first submission, and this is in November of 2020, her very first submission is none of the respondents received any of the notices of arbitration. That's on the record in the CTAC arbitration. So that's what she told CTAC. So, yes, there may have been a mailing to one of the respondents in May of 2020, and that was delivered. It was to the first respondent. No one is disputing that. But no one appeared for that respondent until five, six months later. And that's the issue, right? The issue is nobody appears in the CTAC arbitration until November of 2020. After the first respondent is now concededly served, they choose not to appear for a long time, and that's the justification for why the entire arbitration is invalid. No, they have not. Absolutely not, Your Honor. There was no concession of valid service. I didn't say there was a concession. There was mailing that was not returned. That kind of counts as service. Not necessarily. And, in fact, look, this arbitration is about Mr. Chin's defenses. Serving a co-respondent, okay, under United States principles of due process, we're not aware of a single case which says that if somebody is a respondent in arbitration, even if that person is a shareholder of a co-respondent, that service on the co-respondent satisfies due process with respect to service of the respondent who's challenging service. There's not a single case which holds that. We cited a bunch of cases which admittedly deal with service under, you know, the federal rules, state procedural rules, and the like. But this is due process. You have to show that it's reasonably calculated, that your notice is going to reach this particular respondent, okay? So counsel says, oh, they served his father's address. What case says that that's okay? Okay. Mr. Kushner, I think your time has expired. Thank you. We'll take the matter under advisement.